We'll now proceed with argument in Mestecky v. City Department of Education. Okay. You may proceed. Mr. Guercio, am I saying this right? Yes, Your Honor. Perfect. May it please the Court, my name is Greg Guercio. I represent the appellants in this case. At the outset, I note that this is a claim that the lower court erred in connection with its dismissal summary judgment in connection with both retaliation and defamation counts. As to the retaliation, we believe that the court misconstrued its obligations under McDonnell-Douglas. It is clear from the lower court's decision itself that the plaintiff made out a prima facie case. At that point, the burden of proof shifted to the defendants in that case in order to come forth with dispositive, this court has said, dispositive reasons that are non-discriminatory as a basis for the termination. Sir, just for my own clarification, and I'm sure about the rest of the panels, what is the unit of retaliation here? Is your client complaining about the termination or about the placement in the ATR pool or both? Because I would have, as to the ATR pool, a lot of the arguments you're making about temporal proximity and things like that don't seem to be existing. But let me – I just want to make sure I understand exactly the universe of retaliation claims. The answer is both. Both. Okay. And I will, if you can expound upon that right now, in that the records of the plaintiff were expunged as a result of the realization that they made an error in terminating her originally. They then put her in the ATR, which is clearly not a restoration of her rights. But they said they had to, under the agreement that they had, that they were obligated to do so. And I know you're going to tell me about Mr. Peoples' testimony, but it doesn't say what you think it says. Well, I respectfully submit that there is certainly sufficient proof to have a question of fact as to whether the ATR is sufficient as a restoration of the plaintiff's rights. And frankly, Judge, it defies common sense to say that the records should be expunged, that the plaintiff is a teacher in good standing, and then not restore her position. The issue of whether they had to go into the ATR depended upon whether she was entitled to be restored to her position as opposed to being provided with something that is clearly less, because it is common knowledge. I thought what she was seeking was tenure, which she got. She was seeking tenure and the restoration of her position. So she has a right to go to the same school, in the same classroom, with maybe the same students. Absolutely. That's absolutely. Absolutely, Judge. She was wrongly terminated. In fact, Even though there might be an agreement between the union and the DOE that says we can't force a school to take a teacher without the principal's okay, that's negotiated. In order to meet the requirements of an ADA claim, you have to be able to put them back in where they were. Your Honor, that's factually incorrect. There is no agreement between the union and the DOE with regard to mandatory assignments to the ATR. In fact, the record is pretty clear that you go to the ATR as a result of DOE policy when your position has been accessed or when you are the subject of a disciplinary proceeding. There is no record that establishes or even sets forth evidence that under any circumstances, when you are removed even wrongly from your position, that once you admit that you're wrong, that you can nevertheless put the person in the ATR. That ATR is confined in its, in those who are assigned there, to two categories of people. You've been properly accessed under the education law, and recalled, and you have been placed in there as a result of a disciplinary proceeding. That's what Peoples actually says, in that he believes that she was entitled to her position, but she went to the ATR under some nonexistent agreement between her and DOE. And that didn't happen. As to the defendant's obligations, the evidence is pretty, it's actually overwhelming, that the plaintiff's evaluations were false, proved by their own records, because the evaluation that happens two weeks after she is determined or she has notified them that they told her before the denial of tenure and the termination, that if she didn't agree to extend the probation period, she would be denied tenure. Right? They told her that. That's undisputed in the record. That's correct. And that all happens after she tells them that she is complaining that she is being discriminated against in connection with her performance. She — That happened before. No — She is told, she's asked, right, if she will extend the probationary period. Right? She is asked. She is never told — I'm sorry. That if she doesn't do that, that tenure will be denied. Right? No. That is incorrect, Judge. She is told — she is asked on September 19, 2012, if she will extend her probationary appointment. She says, I think I've been discriminated against by you doing that. This is the second time you want me extended after I've had — But she wasn't in the school to be observed for most of the time, right? No. No. Incorrect, Judge. She takes a leave of absence which is authorized by her and — But she can't be observed in a classroom while she's on a leave of absence, right? Judge, she is not observed for three years, notwithstanding the fact that she has been in the job for over two of those three years. In fact, as a — Your principal, right, so the principal wanted an opportunity to — this is what the stated reason for the — That's his stated reason. He wants to have more time to evaluate since he's new. And so during the time that he is there, how many months is she in the school, in the classroom? She's there two out of the three years that he's there, and he never comes in to see her once. In fact, he doesn't come in to see her until after he makes a recommendation to the superintendent of schools to terminate her employment. And it is at that point that he goes into her room for a very brief period and then writes an evaluation, which is negative in a checklist, as to every single point that over the three years before he had evaluated her as satisfactory. Sure, but he had already told her then that it was — there was a very high likelihood she was not getting tenure. Is that not correct? Well, he told her because he said he wanted more time to evaluate her. And her response was, where have you been for the three years that I've been in this building? She comes back to work in January of 2012 after she was there all of 10-11, never observed by him. I want to come back to something you said a minute ago. On September 19th is when she complains about being discriminated against, right? That's correct. But September 4th is when she's asked to extend the probationary period and is told that if she doesn't agree to extend that period, she's going to be denied tenure. No, Your Honor, I respectfully submit that that's being misread. He does not have the authority — Fairweather does not have the authority to terminate employment. All he says is that I'm going to make a recommendation to the superintendent of schools. The superintendent of schools does not make a decision with regard to this issue until October, two weeks after. And this Court has held repeatedly that it's only as a result of the decision by the final decision-maker. That's what is so, frankly, outrageous in this case. All of the issues set forth by the appellees as the basis for the reason of her termination, they all come from Fairweather. Lloyd Bay, the superintendent of schools who makes the final decision in this case, she actually says on the record she didn't use any of those decisions. But below, you spoke of Fairweather. It's only on appeal that you're focusing on Ms. Lloyd Bay. Is that not correct?  No, Your Honor, not at all. I don't know. The focus on Fairweather has to do with the fact that he is the one who initially discriminates against her by filing the false and backdated evaluation, by making false statements about her attendance, saying that she is out of work for 11 days when there's a 10-day threshold, when in reality she's only out three or four days, by talking about her appearance when for three years he evaluates her, saying her appearance is impeccable, with talking about inappropriate rigor or insufficient rigor in her classrooms when he never observes her. And in reality, the people who did conduct the observations do not complain about her rigor and testify to that effect in connection with their depositions. All of that certainly rises to the level of creating a question of fact for a jury. What happens in this case is that the lower court inappropriately and beyond her authority goes so far as to decide those factual issues when there is no legal basis for her to do so. I'm almost out of time, Your Honor, with regard to the red lights. Oh, I'm sorry. Is there something you wanted to say just to wrap up? Well, I wanted to speak about the defamation, but clearly the hot nature of this Court is such that you don't get to it. All right. Well, we have your briefs. Thank you. We'll now hear from Ms. West. Good morning, Your Honor. May it please the Court. Melanie West for the New York City Department of Education. This appeal challenges the dismissal at summary judgment of two of Ms. Stuckey's claims for retaliation under Title VII and defamation. The retaliation claim as to FMLA went to a jury, which found for DOE.  Let me just start by going over the timeline of what happened. So the first conversation, according to Ms. Stuckey, and this is at page 169 of the joint appendix, she testifies that on the first day of school, Principal Fairweather. September 4th of 2000. Correct. Told her that he was asking her to extend her probationary period and that if she refused, her tenure would be denied. Correct. The second conversation happens on September 19th, and that's the recorded conversation. That's at page 338 of the record. So on the very first day of school, her own testimony is that she was told that her tenure would be denied if she didn't agree to extend her probation. And that's what happened. On October 1st, she gets a letter from Fairweather saying that Fairweather and Lloyd Bay have mutually agreed to terminate the probationary, or deny tenure because of her refusal to extend her probationary period. And then on October 21st, she gets the formal notification giving 60 days till the discontinuance, and that's from Lloyd Bay. And so the record establishes very clearly that she was told from day one of school that this was what was going to happen if she refused to extend her probationary period. It's consistent with the way all the other teachers were treated. When Principal Fairweather started at the school in 2010, all probationary teachers were asked to extend their probation for a year, and the reason given was that he wanted one year to be able to observe them before he recommended any of them for tenure. He never got that year with Ms. Mastecchi, and therefore her tenure was denied. But is it not somewhat noteworthy that after having a series of positive or satisfactory evaluations, suddenly at the end they suddenly become negative? I mean, I don't know that I can get into the forensics enough to understand the backdating issue, but it does seem somewhat odd. It does look like they're looking for a post hoc rationalization of the decision to discontinue her, and I don't know why they weren't more clear in just saying however good or bad she is, she refuses to extend her tenure. It seems like they were trying too hard. I mean, I don't think it's contradictory. I think the standards to which a first-year probationary teacher are held are a little different than the standards to which a teacher who's up for tenure are held. Just in terms of, you know, evaluating whether someone's work is good or not, it's a little different when the question on the table is whether or not they're going to be given tenure. And I think it's consistent with what he told her, which is that, Fairweather, sorry, told Mastecchi, which is that he thought she had promise, but that she wasn't yet ready for tenure. And so when forced to answer the question on an evaluation of whether this is a teacher I recommend for tenure, in that context he found that her performance was unsatisfactory. So I don't think it's necessarily contradictory that she had ‑‑ she was judged satisfactory as a first or a second-year probationary teacher, but when it came time to answer the question of whether she had a performance sufficiently satisfactory to be recommended for tenure, the answer was different. But the nondiscriminatory or the nonretaliatory basis for the action was that she wouldn't agree to extend probation or that she had bad test scores or other performance‑related issues. I mean, I think it's both, Your Honor. I think it's primarily what was made clear from day one, which is that they needed more time. But it's ‑‑ the way it was presented to her was they needed more time to observe her. It was presented by Fairweather. Right. But you agree, Fairweather doesn't have the authority to make a hiring or a tenure or a nontenure decision. Well, the final decision rests with the superintendent. But throughout this litigation this question was addressed by all parties as if it was a mutual decision made by Lloyd Bay and Fairweather, made by Lloyd Bay based on Fairweather's recommendation. I mean, she never observed Ms. Mastecchi herself, the superintendent, and her decision was based on his recommendation, and that's what she testified to. I mean, was the warning that if you don't extend probation you're not getting tenure made with the knowledge of or consultation of Lloyd Bay, according to the record? Right. That's not initially in the record. Then you see correspondence between the two of them where he says she's not agreeing to extend her probation. What's the next step? So, you know, eventually Lloyd Bay testifies that the reason she was denied tenure was that she refused to extend her probation. Right. But that decision is made later in September or early October. Right. I mean, it's conveyed to her formally on October 21st by Lloyd Bay. It's conveyed to her in a letter before that by Fairweather who says it's a joint decision or a mutual decision of himself and Lloyd Bay. And that's October 1st. Could you address briefly the ATR point that Garcia was talking about? Right. So, I mean, the record is quite clear on this point. People's testified and the record shows that there was a policy at the time, it has changed, that there was no forced placement of teachers in schools. And so a teacher coming back couldn't be assigned to a particular position. And... Coming back from maternity leave? No, coming back from any sort of disciplinary proceeding like a 3020A or an Article 78, any proceeding during which they had been removed from the school environment or put into the ATR pool. I think the no forced placement was in the collective agreement, but not the policy of putting anyone in the ATR. So they're related, but they're slightly distinct. So getting your position back as part of the collective bargaining agreement, that couldn't be forced into... Right. Getting your position back as in getting a job at DOE back. So getting put in the ATR, that was just the policy of the DOE. I believe so. Same salary, same benefits, same seniority. Yes. And I'll just very briefly address the defamation claim. Performance evaluations are generally subject to common interest privilege, unless there is evidence of malice or ill will. There isn't in this case. The performance evaluation in question is just a series of check marks. I guess the only statement that is sort of provably false or true is absences. Right. Right. So, I mean, assuming for the purposes of, you know, this appeal and summary judgment that Ms. Mastecchi is correct, that they were wrong, you know, there's nothing in the record that indicates that this was a dispositive issue in denying her tenure. The defamation claim, it doesn't really matter whether it was a dispositive issue. Right. So, I mean, the question is... The defamation claim is, is this false statement about number of absences the sort of thing that is deemed defamatory? Right. I mean, I don't think it rises to the level of defamation. It's not, you know, this Court and State Courts have consistently held that in order for a statement to rise to the level of being defamatory, the number of absences, you know, there could easily be 11 excused absences that doesn't reflect poorly on the teacher's performance at all. I mean, it's a bare notation of a number of days. It can't possibly be considered defamatory without more. Disclosure to public, hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace. No, Your Honor. I don't think it did. Unless there are further questions, we'll rest and repeat. All right. Thank you both. We'll reserve decision.